UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SKYLER JAMES FOWLER,

Plaintiff

v.

STEVE SISOLAK, et al.,

Defendants

Case No. 2:19-cv-01418-APG-DJA

**SCREENING ORDER ON
THIRD AMENDED COMPLAINT**

On July 6, 2020, I screened plaintiff Skyler James Fowler's second amended complaint, dismissing some claims, allowing other claims to proceed, and giving Fowler leave to file a third amended complaint (TAC). ECF No. 18.  Fowler has filed a TAC (ECF No. 62) and numerous motions.  I now screen the TAC and address some of Fowler's motions.

**I.     SCREENING STANDARD**

Federal courts must conduct a preliminary screening in any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a).  In its review, the court must identify any cognizable claims and dismiss any claims that are frivolous, malicious, fail to state a claim upon which relief may be granted or seek monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1),(2).  *Pro se* pleadings, however, must be liberally construed. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

In addition to the screening requirements under § 1915A, the Prison Litigation Reform Act (PLRA) requires a federal court to dismiss a prisoner's claim, if "the allegation of poverty is untrue," or if the action "is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2). Dismissal of a complaint for failure to state a claim upon which relief can be granted is provided for in Federal Rule of Civil Procedure 12(b)(6), and the court applies the same standard under § 1915 when reviewing the adequacy of a complaint or an amended complaint. When a court dismisses a complaint under § 1915(e), the plaintiff should be given leave to amend the complaint with directions as to curing its deficiencies, unless it is clear from the face of the complaint that the deficiencies could not be cured by amendment. *See Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995).

Review under Rule 12(b)(6) is essentially a ruling on a question of law. *See Chappel v. Lab. Corp. of America*, 232 F.3d 719, 723 (9th Cir. 2000). Dismissal for failure to state a claim is proper only if it is clear that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999). In making this determination, the court takes as true all allegations of material fact stated in the complaint, and the court construes them in the light most favorable to the plaintiff. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996). Allegations of a *pro se* complainant are held to less stringent standards than formal pleadings drafted by lawyers. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980). While the standard under Rule 12(b)(6) does not require detailed factual allegations, a plaintiff must provide more than mere labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A formulaic recitation of the elements of a cause of action is insufficient. *Id*.

2

Additionally, a reviewing court should "begin by identifying pleadings [allegations] that, because they are no more than mere conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported with factual allegations." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Finally, all or part of a complaint filed by a prisoner may therefore be dismissed *sua sponte* if the prisoner's claims lack an arguable basis either in law or in fact. This includes claims based on legal conclusions that are untenable (e.g., claims against defendants who are immune from suit or claims of infringement of a legal interest which clearly does not exist), as well as claims based on fanciful factual allegations (e.g., fantastic or delusional scenarios). *See Neitzke v. Williams*, 490 U.S. 319, 327-28 (1989); *see also McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991).

## II.    SCREENING OF THE TAC

Fowler sues multiple defendants for events that took place while he was incarcerated at High Desert State Prison (HDSP). ECF No. 62 at 1. Fowler sues Steve Sisolak, Brain Sandoval, Monique Hubbard-Pickett, Brian Williams, A Lozano, Charles Daniels, Harold Wickham, James Dzurenda, Dr. Michael Minev, Dr. Romeo Aranas, Dr. Bob Faulkner, Pam Delporto, Georges-Pele Taino, A. Buen, Julio Calderin, Sanders, Dr. Bryan, Dr. Agustin, Roberson, Jay Barth, Dolphin, Cooper, State of Nevada ex rel NDOC, V. Johnson, Jeremy Bean, Calvin Johnson,

Robin Hager, Mr. Wilson, Jane Does 1-4 and John Does 1-23. *Id.* at 2-17.  Fowler alleges 17 counts and seeks monetary, declaratory, and injunctive relief.

### A. Count I

In Count I, Fowler alleges that he was diagnosed with OCD as a child and first began taking psychotropic medication at nine years old. ECF No. 62 at 19.  Since mid-2016, Fowler has also been taking medication for depressive disorder and generalized anxiety disorder. *Id.*  Fowler has a history of suicidal ideation and severe suicide attempts, including an incident when he cut three veins and two arteries while detained at Clark County Detention Center. *Id.*

When Fowler first arrived at HDSP, he met with a psychologist or psychiatrist, Jane Doe 1. *Id.* at 22.  He explained his history of suicide attempts and his need for his medications, but she did not take any steps to ensure that Fowler received his medication or provide him any temporary medication. *Id.*  When Fowler goes without his Sertraline for even a single day, he experiences symptoms ranging from mental pain, to excruciating mental pain, to suiciding-inducing mental pain. *Id.*  For this reason, health professionals recommend that patients take such medication at the same time every day. *Id.*

For his first five days at HDSP, Fowler did not receive any of his medication, and he was told that it would take time for the medication to "catch up" with him. *Id.* at 19.  After five days, Fowler began receiving his medication, but he was frequently denied medication for a variety of reasons, including the prison running out, Fowler being asleep, or staff believing that he was in a different cell. *Id.*

After 52 consecutive days in his cell, the last three of which Fowler did not have his medication, Fowler cut a baseball size hole in his thigh and cut his femoral artery. *Id.*  Fowler

1   lost so much blood that he had to be carried down the stairs and placed on a gurney; Fowler was

2   taken to the University Medical Center, where had surgery. *Id.* at 19-20.

3         On December 29, 2018, Fowler stopped receiving his medication. *Id.*  On January 1,

4   2019, Fowler filed an emergency grievance indicating his need for his medication. *Id.*  John Doe

5   1 responded that the psychiatrist would not be in until January 8 and that they could not renew

6   his medication until then. *Id.*  On January 4, Fowler filed another emergency grievance,

7   requesting to see the on-call doctor. *Id.* John Doe 2 similarly responded that a new psychiatrist

8   would be starting soon, but that Fowler had to wait for up to another eight days before seeing the

9   psychiatrist. *Id.*  On January 7, Fowler filed a third emergency grievance, stating that his

10  symptoms were getting worse, and that if a doctor was not available, he wanted to be taken to the

11  emergency room. *Id.*  John Doe 3 simply replied that medical had been notified and that Fowler

12  should file an informal grievance, which he did. *Id.*  On January 14, Fowler filed a fourth

13  emergency grievance. *Id.*  Lieutenant Glass called Fowler into his office, called medical to

14  inform them of the situation, and responded to Fowler's grievance that the issue was being

15  addressed by medical, which was awaiting doctor's orders. *Id.*

16        On January 21, 2019, Fowler received his Vistaril, and on January 22, he received his

17  Sertraline. *Id.*  The 23 days without his medication were tortuous for Fowler. *Id.* at 26.  In his

18  grievances, Fowler explained that he was experiencing multiple symptoms, including relentless

19  anxiety, depression, lethargy, panic attacks, insomnia, hyper-sensitivity, extreme irritability,

20  dizziness, falling and hitting his head multiple times, anguish, foggy cognition, frequent and

21  persistent migraines, vomiting, debilitating OCD, severe pain of an indescribable nature,

22  difficulty breathing, blackouts, seizures, and the feeling that someone had poured glue into his

23  brain. *Id.* at 21.

1     Dr. Minev and Hager are responsible for hiring and retaining medical staff. *Id.*  For years

2   they have employed only a single psychiatrist for the entire inmate population of Nevada. *Id.*

3   When the previous psychiatrist's employment was terminated shortly before Fowler stopped

4   receiving his medication, they did not take any steps to ensure that inmates would have access to

5   psychiatric treatment until a new psychiatrist started. *Id.*  Dzurenda, Daniels, Dr. Aranas, and Dr.

6   Minev are responsible for instituting the policy that only a single psychiatrist should be hired to

7   care for over 10,000 inmates in the NDOC system. *Id.* at 28.

8     On January 25, 2019, three days after Fowler's 23 days without medication, Fowler was

9   again denied his medication. *Id.* at 22.  The PM pill call nurse, Jane Doe 2, told Fowler that his

10  medication had been switched to AM pill call, and she refused to give him his medication. *Id.*

11  Fowler filed an emergency grievance, and he received his medication the next morning, but after

12  that he was again deprived of his medication on January 27 and January 28. *Id.* at 22-23.

13    Meanwhile, on January 23, 2019, Fowler received Hubbard-Pickett's denial of his

14  informal grievance regarding the lack of medication. *Id.* at 23.  Hubbard-Pickett denied the

15  grievance over a minor technicality and failed to provide Fowler any assistance. *Id.*

16    On January 29, 2020, Fowler filed an emergency grievance, which John Doe 4 denied on

17  the basis that it was not an emergency. *Id.*  John Doe 4 did not provide Fowler any assistance. *Id.*

18  Fowler did not receive his medication on February 6 or February 9. *Id.*  Fowler filed another

19  emergency grievance, and this time Sergeant Quinn called medical and fixed the problem. *Id.*

20  After that, Fowler again began to receive his medication on a regular basis. *Id.*

21    Starting on January 9, 2019, Fowler filed multiple grievances requesting that he be

22  granted permission to "keep on person" (KOP) for some of his medication. *Id.*  This would have

23  allowed him to ensure that he did not miss his medication due to various mix-ups. *Id.*  But Buen,

1 Dr. Faulkner, and Dr. Minev all denied Fowler's grievances and did not take any action to ensure

2 that he would receive his medication on a consistent basis. *Id.*

3       On May 21, 2019, Fowler was moved from unit 10 to unit 12. *Id.*  John Doe 5, the pill

4 call nurse in unit 10 failed to bring Fowler's medication to unit 12 or update the system so that

5 Fowler would be given his medication. *Id.* at 23-24.  John Doe 6, the pill call nurse in unit 12

6 refused to walk over to unit 10 to get Fowler's medication. *Id.* at 24.  As a result, Fowler did not

7 get his medication that day. *Id.*  The following day, John Doe 7, the pill call nurse in unit 10, and

8 Jane doe 3, the pill call nurse in unit 12 also failed to ensure that Fowler received his medication.

9 *Id.*  Because nobody updated Fowler's location, he also did not get his medication the following

10 day. *Id.*

11       On September 15 and 16, 2019, Fowler's Sertraline was not available. *Id.*   Pill call

12 nurses John Does 8 and 9 refused to contact the pharmacy or otherwise help Fowler. *Id.*  On

13 September 17, 2019, Fowler filed an emergency grievance asking that he either be given his

14 medication or taken to a hospital. *Id.*  After not receiving a response for several hours, Fowler

15 asked Dolphin for help and indicated that he was suicidal due to the lack of medication. *Id.*

16 Dolphin refused to help and encouraged Fowler to kill himself. *Id.* at 25.  Someone eventually

17 responded to Fowler's emergency grievance and brought him his medication. *Id.*  But Dolphin's

18 refusal to help caused a delay of several hours and dramatically exacerbated the severity of

19 Fowler's suffering. *Id.*

20       On October 8, 2019, John Doe 10 ordered Fowler moved to unit 5C without notice and

21 without consulting mental health staff. *Id.*  After threatening self-harm over the move, Fowler

22 spoke to the staff psychologist and indicated his fear that he would be deprived of his medication

23 for several days due to the move. *Id.* at 25-26.  The psychologist indicated that she would call

medical to ensure that Fowler received his medicine. *Id.* at 26.  Fowler assumes that medical was called, but that John Doe 11 failed to update the pill call list despite being told to do so. *Id.*  John Doe 12, the pill call nurse in Fowler's previous unit, unit 12, also failed to update the pill call list and did not bring Fowler his medication. *Id.*  As a result, he did not receive his medication that night. *Id.*

On October 21, 2019, Fowler again did not receive his medication. *Id.*  The next day, Fowler sent Dr. Minev a kite asking for KOP status to at least be allowed a few spare doses of medication in case he was denied medication for some reason. *Id.*  Fowler never received a response. *Id.*

On November 4, 2019, Fowler was again moved and again did not receive his medication because John Doe 13, the pill call nurse at his previous unit, did not bring his pills to his new unit. *Id.* at 27.  Fowler filed an emergency grievance, but Sergeant Barth denied the grievance, stating that it was not an emergency and that Fowler should file an informal grievance. *Id.*  As a result, Fowler did not receive his medication that day. *Id.*

On December 23 and 24, 2019, Fowler was again denied his medication. *Id.*  Fowler filed an emergency grievance each day, but John Doe 14 denied the grievances, falsely claiming that Fowler did not show up for pill call. *Id.*  As a result of John Doe 14 denying Fowler's grievances, he did not receive his medication either day. *Id.*

On February 5, 2020, Fowler was given KOP status for his Sertraline. *Id.*  Fowler was told that the decision was made in order to reduce staff man-hours at the pill call. *Id.*

Based on these allegations, Fowler alleges that Dr. Minev, Hager, Dr. Aranas, Dzurenda, Daniels, and John Does 1-14 and Jane Does 1-3 were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and Article 1, Section 6, of the Nevada

Constitution.[1] *Id.* at 18.  Based on the allegations in the TAC, I liberally construe the TAC as also bringing claims against Hubbard-Pickett, Buen, Dr. Faulkner, and Dolphin.

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations omitted).  To satisfy the deliberate indifference prong, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.*  "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* (internal quotations omitted).  When a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show

---

[1] Cruel and unusual punishment claims under the Nevada Constitution generally follow the same standards as the United States Constitution. *See, e.g., Allred v. State*, 92 P.3d 1246, 1253 (Nev. 2004); *Naovrath v. State*, 779 P.2d 944, 947 (Nev. 1989).  For purposes of screening, I assume that the Nevada Constitution prohibits the same conduct that is prohibited by the Eighth Amendment.  I will not separately discuss Fowler's claims under Article 1, Section 6, of the Nevada Constitution.

1  that the delay led to further injury. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d

2  404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to

3  state a claim of deliberate medical indifference").

4  Furthermore, a defendant is liable under 42 U.S.C. § 1983 "only upon a showing of

5  personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  "A

6  supervisor is only liable for constitutional violations of his subordinates if the supervisor

7  participated in or directed the violations, or knew of the violations and failed to act to prevent

8  them.  There is no respondeat superior liability under [§]1983." *Id*.; *see also Ashcroft v. Iqbal*,

9  556 U.S. 662, 676 (2009) (holding that "[b]ecause vicarious liability is inapplicable to *Bivens*

10  and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the

11  official's own individual actions, has violated the Constitution").

12  "A showing that a supervisor acted, or failed to act, in a manner that was deliberately

13  indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the

14  involvement—and the liability—of that supervisor." *Starr v. Baca*, 652 F.3d 1202, 1206-07 (9th

15  Cir. 2011).  "Thus, when a supervisor is found liable based on deliberate indifference, the

16  supervisor is being held liable for his or her own culpable action or inaction, not held vicariously

17  liable for the culpable action or inaction of his or her subordinates." *Id*. at 1207.  As such, "a

18  plaintiff may state a claim against a supervisor for deliberate indifference based upon the

19  supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her

20  subordinates." *Id*.

21  "Supervisory liability exists even without overt personal participation in the offensive act

22  if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of

23

10

1    constitutional rights' and is 'the moving force of the constitutional violation.'" *Hansen v. Black*,

2    885 F.2d 642, 646 (9th Cir. 1989).

3                    **1.   Defendants with Direct Knowledge of Fowler's Medical Needs**

4            Fowler states colorable claims of deliberate indifference to a serious medical need under

5    the Eighth Amendment and the Nevada Constitution based on the various delays in his receiving

6    medication.  I liberally construe the TAC as alleging that Fowler has significant mental health

7    issues for which he receives a variety of medications.  Going even a single day without his

8    medication causes Fowler to suffer from a variety of severe symptoms, including depression,

9    migraines, severe pain of an indescribable nature, difficulty breathing, blackouts, and seizures.

10   At various times when Fowler did not receive his medication, he asked Dr. Minev, Hubbard-

11   Pickett, Buen, Dr. Faulkner, Dolphin, and John Does 1-9 , John Does 11-14, and Jane Does 1-3,

12   either directly or through the grievance process, to help ensure that he received his medication.

13   These defendants did not act to ensure that he received his medication.  As a result, Fowler went

14   without his medication on multiple occasions and experienced a variety of severe symptoms.

15   John Doe 10 moved Fowler to a new unit without notice and without consulting medical staff, as

16   he was required to do, in disregard of Fowler's medical needs.  These allegations are sufficient to

17   state a colorable claim for purposes of screening.  This claim will proceed against Dr. Minev,

18   Hubbard-Pickett, Buen, Dr. Faulkner, Dolphin, and John Does 1-14 and Jane Does 1-3 when

19   Fowler learns their identities.[2]

20   / / / /

21

22   [2] Although the use of "Doe" to identify a defendant is not favored, flexibility is allowed in some
     cases where the identity of the parties will not be known prior to filing a complaint but can
     subsequently be determined through discovery. *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir.
23   1980).  If the true identity of any of the Doe Defendants comes to light during discovery, Fowler
     may either move to substitute the true name of the Doe Defendant or move to amend the TAC to
     assert claims against the Doe Defendant at that time.

### 2.  Supervisory Liability Defendants

Fowler states a colorable supervisory liability claim based on the policy of hiring only a single psychiatrist to treat all the inmates in NDOC.  I liberally construe the TAC as alleging that Dr. Minev, Dr. Aranas, Dzurenda, and Daniels instituted a policy that NDOC should only employ a single psychiatrist.  Dr. Minev and Hager followed this policy and only hired a single psychiatrist.  As a result of this policy, when the psychiatrist left NDOC's employ, NDOC did not have any psychiatrist on staff who could ensure that inmates' prescriptions were renewed on a timely basis.  This led to a 23-day delay in Fowler having his prescription renewed.  The delay in receiving his medication caused Fowler to suffer a variety of severe symptoms.  These allegations are sufficient to state a colorable claim on screening.  This claim will proceed against Dr. Minev, Dr. Aranas, Dzurenda, Daniels and Hager.

### B.  Count II

In Count II, Fowler alleges that during his 23-day deprivation of Sertraline he suffered a fainting spell during which he smacked his head on the concrete floor of his cell. ECF No. 62 at 30.  As a result, Fowler began suffering from a variety of additional neurological problems, including seizures, migraines, and severe memory issues. *Id.*  Fowler has notified Buen, Dr. Faulkner, Dr. Minev, Hubbard-Pickett, Dr. Depry, and John Doe 15 of his seizures. *Id.*  Dr. Depry is the only one who has tried to help him. *Id.*

Dr. Depry prescribed Fowler Tegratol, but that did not help him. *Id.*  Finding an effective drug for treating mental health problems is a process of trial and error. *Id.*  As a child, Fowler had to try 20 different drugs before finding one that helped with his OCD. *Id.* at 31.  Because Dr. Minev, Dzurenda, Daniels, and Hager have a policy of only hiring a single psychiatrist to treat all NDOC inmates, Fowler can only see Dr. Depry once or twice per year. *Id.* at 30-31.  As a

result, Fowler has not had sufficient appointments with Dr Depry for a proper evaluation, much less a proper treatment plan. *Id.*

Based on these allegations, Fowler alleges that Dr. Minev, Hager, Dzurenda, Daniels, Hubbard-Pickett, Buen, Dr. Faulkner, and John Does 1-3 and 15 were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and Article 1, Section 6, of the Nevada Constitution. *Id.* at 30.

### 1.   Defendants with Direct Knowledge of Fowler's Medical Needs

Fowler states a colorable claim of deliberate indifference to a serious medical need based on the failure to treat his seizures.  I liberally construe the TAC as alleging that Fowler suffers from a variety of neurological issues, including seizures, migraines, and severe memory issues. Fowler informed Buen, Dr. Faulkner, Dr. Minev, Hubbard-Pickett, and John Doe 15 of these issues and his need for treatment, but none of them acted to ensure that Fowler received proper medical treatment.  As a result of the lack of treatment, Fowler has continued to suffer from these severe issues.  These allegations are sufficient to state a colorable claim on screening.  This claim will proceed against Buen, Dr. Faulkner, Dr. Minev, Hubbard-Pickett, and John Doe 15.

Fowler fails to state a colorable claim against John Does 1-3.  Fowler appears to name them as defendants based on the theory that they failed to provide him Sertraline, as described in Count I, which led to his fall and the resulting neurological issues.  But I have already addressed the failure to provide Fowler Sertraline in Count I.  Fowler does not allege that these defendants were in any way involved in the failure to treat his seizures, so I dismiss them from this count without prejudice.

/ / / /

/ / / /

### 2. Supervisory Liability Defendants

Fowler states a colorable supervisory liability claim based on the policy of hiring only a single psychiatrist to treat all the inmates in NDOC. I liberally construe the TAC as alleging that Dr. Minev, Dzurenda, Daniels and Hager are responsible for a policy that NDOC should only employ a single psychiatrist. As a result of this policy, Fowler can only see the psychiatrist once or twice a year. This limitation prevents the psychiatrist from doing a proper evaluation, much less developing a proper treatment plan for Fowler and is directly responsible for the failure to treat Fowler's neurological issues.

Fowler separately alleges that according to AR 600.01, Dr. Faulkner is required to "provide for the detection, diagnosis, treatment, and referral of inmates with mental health problems at their respective institutions." Fowler alleges that Dr. Faulkner failed in this duty. This allegation does not give rise to an Eighth Amendment claim. Fowler does not identify any policy instituted by Dr. Faulkner that was so deficient that the policy itself was a repudiation of constitutional rights. To the extent that Fowler is trying to bring a supervisory liability claim against Dr. Faulkner, based on the allegation that Dr. Faulkner failed to fulfill his duties under AR 600.01, I dismiss this claim without prejudice.

### C. Count III

In Count III, Fowler provides further details about an incident that he previously addressed in Count I during which Dolphin refused to provide him an emergency grievance and encouraged Fowler to kill himself. ECF No. 62 at 32. Fowler alleges that Dolphin has a reputation for being hostile toward individuals whom he considers weak, such as inmates in protective segregation, suicide attempters, gays, and "so-called 'cry babies.'" *Id.* When Fowler asked for help getting his medication or an emergency grievance, Dolphin responded by telling

Fowler to just kill himself already, to "shut yo gay ass up," to "suck [Dolphin's] dick," and threatening to physically injure Fowler. *Id.*  Dolphin then similarly verbally attacked several other inmates who fit into one of the above categories of perceived weakness. *Id.*  Dolphin sadistically toyed with various inmates throughout dinner. *Id.*

Fowler alleges Dolphin violated his rights under the Eighth Amendment and Article 1, Section 6, of the Nevada Constitution, as well as the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act (RA), 29 U.S.C. § 794. *Id.* at 32.

### 1. Eighth Amendment

Fowler does not explain the basis of his Eighth Amendment claim.  I have already addressed Fowler's claim that Dolphin failed to get his medication in Count I.  Thus, I dismiss any such claim in Count III without prejudice.  I construe Fowler's Eighth Amendment claim to be based on Dolphin's alleged verbal harassment.

The Eighth Amendment generally does not prohibit the exchange of verbal insults between inmates or guards. *Wood v. Beauclair*, 692 F.3d 1041, 1050 (9th Cir. 2012) (discussing *Somers v. Thurman*, 109 F.3d 614, 622 (9th Cir. 1997)).  To state a viable claim for verbal harassment, a prisoner must show that the offending comments were "gross even for a prison setting and were calculated to and did cause him psychological damage." *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996).  This is true even where the verbal harassment is of a sexual nature. *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004) (holding that "the Eighth Amendment's protections do not necessarily extend to mere verbal sexual harassment.")

Fowler states a colorable Eighth Amendment claim.  Dolphin's various sexual comments, while inappropriate, are not "gross even for a prison setting." *Cf. Austin*, 367 F.3d at 1171 (prison official exposing himself for 30 to 40 seconds was not sufficiently serious to constitute

Eighth Amendment violation). However, Dolphin telling Fowler to kill himself was arguably gross even for a prison setting.

I liberally construe the complaint as alleging that Fowler had multiple serious suicide attempts. Fowler told Dolphin that he had not received his medication for two days and that he had already filed an emergency grievance, which stated that he was suicidal, and asked to be taken to the hospital if his medication was not available. In response, Dolphin encouraged Fowler to kill himself. Encouraging a suicidal inmate to kill himself is arguably gross even for the prison setting. Given the context of Dolphin's comment, it was arguably calculated to cause Fowler psychological damage, and based on Fowler's allegations, psychological damage resulted. For purposes of screening, these allegations are sufficient to state a colorable claim. This claim will proceed against Dolphin.

### 2. ADA and RA

Both the ADA and the RA apply in the prison context. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir. 2010). The ADA says that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The RA says that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A prison inmate states a colorable claim under both the ADA and RA if he alleges that he was "improperly excluded from participation in, and denied the benefits of, a prison service,

1    program, or activity on the basis of his physical handicap." *Armstrong v. Wilson*, 124 F.3d 1019,

2    1023 (9th Cir. 1997).

3        Fowler fails to state a colorable ADA or RA claim.  The TAC is not entirely clear, but I

4    assume Fowler is alleging that his OCD and depression constitute disabilities under the ADA and

5    RA.  It appears that Fowler is bringing a claim based on the theory that Dolphin denied Fowler

6    the benefit of emergency grievances based on Fowler's OCD and depression.  Fowler alleges

7    that Dolphin mistreats inmates whom he perceives as week, and that Dolphin was mistreating

8    several different inmates at the time of the incident with Fowler.  But Fowler does not allege

9    facts demonstrating that Dolphin withheld the grievance from Fowler based on Fowler's

10    disability, as opposed to some other perceived weakness such as homosexuality.  Based on the

11    allegations in the TAC, Dolphin repeatedly made reference to homosexual acts, but never

12    referenced Fowler's OCD or his depression.  Because the TAC does not allege that Dolphin's

13    actions were due to Fowler's disability, the TAC fails to state a colorable claim under the ADA

14    or RA. I dismiss this claim without prejudice.

15        To the extent that Fowler is trying to bring a claim based on a failure to treat his

16    disability, the Ninth Circuit has held that "the ADA prohibits discrimination because of

17    disability, not inadequate treatment for disability." *Simmons v. Navajo County, Ariz.,* 609 F.3d

18    1011, 1022 (9th Cir. 2010).  "Courts hold that allowing prisoners to utilize the ADA and RA as

19    causes of action for not receiving medical treatment is simply making 'an end run around the

20    Eighth Amendment.'" *King v. Calderwood*, 2:13-cv-02080-GMN-PAL, 2015 WL 4937953, at

21    *2 (D. Nev. Aug. 19, 2015) (citing *Deeds v. Bannister,* 3:11-cv-00351-LRH-VPC, 2013 WL

22    1250343, at *5 (D. Nev. Jan. 8, 2013)).  As such, Fowler does not state a colorable claim under

23    the theory that Dolphin failed to provide him medical treatment.

1

**D.  Count IV**

2      In Count IV, Fowler alleges that on January 10, 2018, he filed a medical kite requesting

3   to be seen for excessively frequent and pungent flatulence. ECF No. 62 at 35.  Fowler filed

4   numerous other kites before finally being seen by Dr. John Doe 16 almost a year later, on

5   December 5, 2018. *Id.*  Dr. John Doe 16 prescribed Fowler ibuprofen to address leg pain, which

6   Fowler had also been complaining about, but Dr. John Doe 16 did not address Fowler's

7   gastrointestinal complaints. *Id.*

8      Fowler filed another kite about the issue on February 2, 2019. *Id.*  He did not receive a

9   response, and on March 2, 2019 he filed an informal grievance about the issue. *Id.*  Fowler noted

10  that his problems continued to get worse and now included chronic constipation, persistent

11  abdominal pain, occasionally bloody stool, and occasional vomiting. *Id.*  Hubbard-Pickett denied

12  the grievance over a technicality, and Fowler refiled it. *Id.*  Buen ultimately denied this grievance

13  five months later.[3] ECF No. 62-2 at 10.

14     On April 22, 2019, nurse practitioner Martin evaluated Fowler and ordered a

15  colonoscopy, lab work, probiotics, antacids, hemorrhoid cream, stool softener, anti-gas

16  medication, and digestive medication. *Id.*  Fowler received only the antacid and stool softener.

17  *Id.*  On May 10, Fowler filed a grievance over the issue, and Dr. Faulkner denied the grievance.

18  *Id.*  On May 30, 2019, in a second-level grievance over a separate issue, Fowler informed Dr.

19  Minev about his ongoing digestive issues. *Id.*  Dr. Minev ultimately denied the grievance without

20

21

_____

22   [3] The TAC does not include any specific allegations about Buen's denial of this grievance. ECF
     No. 62 at 34-38.  But the second amended complaint included an allegation about Buen denying
23   his grievance, lists Buen as a defendant in this count, and included the grievance that Buen
     denied in his exhibits. ECF Nos 24 at 15-16; 62 at 34; 62-2 at 10.  I liberally construe the TAC to
     include a claim against Buen for his denial of this grievance.

1  referencing Fowler's digestive issues. *Id.*  Fowler eventually filed a second-level grievance over

2  his digestive issues, which Dr. Minev denied. *Id.* at 36.

3          In July 2019, Fowler finally had his blood drawn, and was he given hemorrhoid cream

4  for use on internal hemorrhoids, despite the fact that Fowler's hemorrhoids were external. *Id.*

5  Fowler was then seen by Dr. Bryan, who acknowledged that Fowler had been given the wrong

6  hemorrhoid cream but refused to order the correct cream. *Id.*  Dr. Bryan also refused to order

7  digestive enzymes, probiotics, or a colonoscopy. *Id.*  Dr. Bryan refused to prescribe these things,

8  not for medical reasons but because they required higher-level approval and Dr. Bryan did not

9  want to bother getting the approval. *Id.*

10         Later in July 2019, Fowler saw Dr. Agustin. *Id.* at 37.  Dr. Agustin ordered a stool sample

11  kit and told Fowler that he would order probiotics, but he ultimately did not order them. *Id.*  Dr.

12  Agustin did not order a colonoscopy or treat any of Fowler's symptoms. *Id.*  The stool sample kit

13  ultimately tested positive for blood. *Id.*  In August, Dr. Faulkner informed Fowler that the

14  request for a colonoscopy had been denied by the utilization review panel (URP). *Id.*

15         In September 2019, Fowler again met with Dr. Bryan. *Id.*  This time Dr. Bryan told

16  Fowler that he would order the probiotics, order the hemorrhoid cream, and set up a referral to a

17  gastroenterologist. *Id.*  Dr. Bryan said that he would not prescribe the digestive enzymes because

18  he thought that he had a better chance of getting approval for the probiotics if he did not also

19  attempt to prescribe the digestive enzymes. *Id.*

20         Fowler received the hemorrhoid cream, which resolved his hemorrhoid issues, but Dr.

21  Bryan never actually prescribed the probiotics. *Id.*  In December 2019, Fowler saw a

22  gastroenterologist, who recommend probiotics and a colonoscopy. *Id.*  In February 2020, Fowler

23  was told that the URP had approved his colonoscopy and that arrangements were being made. *Id.*

1    In May 2020, Fowler underwent a colonoscopy, but he has not yet received the results of that

2    exam. *Id.* at 38.  Fowler has also put in another request for probiotics after learning that they no

3    longer require approval from the URP, but he has not yet seen a provider about the issue. *Id.*

4           Based on these allegations, Fowler asserts that Dr. Minev, Dr. Faulkner, Dr. Bryan, Dr.

5    Agustin, A. Buen, Monique Hubbard-Pickett, the URP,[4] and Dr. John Doe 16 violated his rights

6    under the Eighth Amendment and the Article 1, Section 6, of the Nevada Constitution.

7           Fowler states a colorable claim of deliberate indifference to a serious medical need

8    against Hubbard-Pickett, Dr. Bryan, Dr. Agustin, Buen, Dr. Faulkner, Dr. Minev, the URP, and

9    Dr. John Doe 16.  I liberally construe the TAC as alleging that Fowler began experiencing

10    gastrointestinal issues in January 2018.  His symptoms have continued to worsen, to include

11    chronic constipation, persistent abdominal pain, occasionally bloody stool, and occasional

12    vomiting.  At various times between December 2018 and September 2019, Fowler informed

13    Hubbard-Pickett, Dr. Bryan, Dr. Agustin, Buen, Dr. Faulkner, Dr. Minev, the URP, and Dr. John

14    Doe 16, either directly or through the grievance process, that he was experiencing serious

15    gastrointestinal issues and needed medical care.

16           In April 2019, Dr. Martin ordered that Fowler receive a colonoscopy and probiotics,

17    among other treatments.  In December 2019, a gastroenterologist also recommended that Fowler

18    receive a colonoscopy and probiotics.  In May 2020, Fowler finally underwent a colonoscopy,

19    though the results of the colonoscopy are not yet known.  Due to the delay in receiving the

20    colonoscopy and other medical care, Fowler continued to experience serious symptoms,

21    including constipation, persistent abdominal pain, occasionally bloody stool, and occasional

22

23    [4] Fowler explains that he is not suing the URP as an organization, but rather an unknown number of Jane and John Does who are members of the URP who participated in the decision to deny him coverage.  For simplicity, I will refer to these Jane and John Does collectively as the URP.

vomiting.  For purposes of screening, these allegations are sufficient to state a colorable claim that Fowler suffered from a serious medical need, that each of these defendants was aware of his medical need, that each of them failed to act to ensure that his medical need was treated on a timely basis, and that Fowler was harmed as a result of the delay in treatment.  This claim will proceed against Hubbard-Pickett, Dr. Bryan, Dr. Agustin, Buen, Dr. Faulkner, Dr. Minev, and the URP and Dr. John Doe 16, when Fowler learns their identities.

**E.  Count V**

In Count V, Fowler alleges that he filed a medical kite on March 23, 2019, seeking treatment for a cavity. ECF No. 62 at 40.  On April 23, 2019, Fowler broke the tooth with a cavity on a small rock in his food. *Id.*  He filed emergency grievances about the issue on April 23, 24, and 27. *Id.*  On May 3, 2019, Dr. Sanders saw Fowler and gave him a filling. *Id.* at 31. Dr. Sanders told Fowler that if the pain persisted, he would need a root canal but that NDOC does not perform root canals. *Id.*  After being unable to sleep due to the pain, Fowler filed an emergency grievance about his pain and his need for a root canal. *Id.* Lieutenant Moreda replied, noting that according to nurse John Doe 17, it was not an emergency and Fowler should speak with a dentist. *Id.*  John Doe 17 did not do anything to help Fowler with his dental issue. *Id.*

Fowler filed a grievance and a kite over the lack of dental care, stating that he was in excruciating pain and asking for a root canal, as well as pain medication in the interim. *Id.*  The response to the kite was that NDOC does not do root canals and that Fowler would be scheduled for an extraction. *Id.*  Taino denied Fowler's informal grievance on the grounds that Dr. Sanders's treatment plan calls for an extraction. *Id.*  But Dr. Sanders only recommended extraction because of the cost, not because an extraction was a medically appropriate treatment for Fowler's tooth. *Id.*  Hubbard-Pickett denied Fowler's first level grievance, and Dr. Faulkner

1  denied a separate grievance in which Fowler mentioned his ongoing dental pain and need for

2  treatment. *Id.*

3         In November 2019, Fowler saw dentist John Doe 18, who X-rayed Fowler's broken tooth

4  as well as two other painful teeth. *Id.* at 41.  Dr. John Doe 18 concluded that Fowler had "gum

5  pockets" but no cavities and gave Fowler ibuprofen for the pain. *Id.*  Dr. John Doe 18 and Dr.

6  Sanders discussed Fowler's request for a root canal. *Id.*  Neither contended that a root canal was

7  not medically necessary, only that they were not allowed to perform them. *Id.*  Fowler alleges

8  that Dr. Minev instituted a policy prohibiting all NDOC dentists from performing or requesting

9  root canals. *Id.*  Dr. Minev and Dr. Faulkner denied Fowler's first and second-level grievances

10 over the issue. *Id.*

11        In March 2020, Fowler submitted kites requesting a dental appointment regarding pain in

12 a different tooth. *Id.* at 41-42.  Fowler was informed he would be scheduled for an appointment.

13 *Id.* at 42. On April 13, 2020, Fowler submitted an emergency grievance, stating that he was in

14 extreme pain and that the medication that he had was not helping enough. *Id.*  The next day,

15 Fowler filed another emergency grievance, noting that he had already been waiting four weeks to

16 see a dentist, and he could not wait for several more months. *Id.* On April 15, Fowler filed a third

17 emergency grievance. *Id.* at 41.  John Doe 19 responded to Fowler's first grievance, stating only

18 that the emergency grievance had been forwarded to dental. *Id.*  John Doe 20 replied to the

19 second and third emergency grievances, noting that dental had been notified to put Fowler on

20 their list, that Fowler could ask the pill passer for pain medication, and that submitting multiple

21 grievances over the same issue was a violation of administrative regulations. *Id.*  John Doe 20

22 did not act to ensure that Fowler received treatment. *Id.*

23

On April 17, nurse Jane Doe 4 came to Fowler's cell to examine him. *Id.*  After Fowler explained his ongoing dental issues, Jane Doe 4 conducted a cursory examination of Fowler's teeth, concluded that it was not an emergency, and told Fowler that she could only put him on the list. *Id.*  She refused to give Fowler any ibuprofen for his pain. *Id.*  Fowler later learned that dental had been closed and would remain closed for at least two weeks. *Id.*

On May 11, 2020, Fowler finally had a dental appointment, and dentist Dr. John Doe 21 told Fowler that HDSP was not equipped to perform root canals and that even if he wanted to give Fowler a root canal, he could not. *Id.* at 42-43.  Dr. John Doe 21 expressed his opinion that dental implants were superior to root canals and that if Fowler had an extraction, he could get a dental implant after he was released from NDOC custody. *Id.* at 43.  Dr. John Doe 21 refused to request a root canal for Fowler, but he did provide Fowler a small bottle of ibuprofen. *Id*

Fowler also alleges that under AR 600.01, Dr. Faulkner was required to make every effort to ensure that the appropriate equipment is available for medical procedures and that Hager was required to contract with outside facilities to provide such care as cannot be otherwise provided by the medical division. *Id*

Based on these allegations, Fowler asserts that Dr. Minev, Dr. Faulkner, Taino, Dr. Sanders, Hager, Jane Doe 4, and John Does 17-21 violated his rights under the Eighth Amendment and the Nevada Constitution.

### 1. Defendants with Direct Knowledge of Fowler's Medical Issues

Fowler states a colorable claim of deliberate indifference to his serious medical needs.  I liberally construe the TAC as alleging that Fowler began seeking medical treatment for a tooth issue in March 2019.  Over the course of the next 14 months, Fowler informed Dr. Minev, Dr. Faulkner, Taino, Dr. Sanders, John Does 17-21, and Jane Doe 4 about his need for dental

treatment.  Dr. Sanders and Dr. John Doe 18 informed Fowler that he should have a root canal but that NDOC policies prohibited them from providing him a root canal and offered to extract his tooth instead.  Based on this allegation, Dr. Sanders and Dr. John Doe 18 both agreed that Fowler should receive a root canal but refused to perform one or request one for Fowler due to NDOC policies.  These allegations are sufficient to state a colorable claim on screening. *See Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) (holding that a "blanket, categorical denial" of medical treatment "solely on the basis of an administrative policy . . . is the paradigm of deliberate indifference").  Fowler informed each of the defendants of his need for a root canal, and they each refused to ensure that he received proper medical treatment.  This claim will proceed against Dr. Minev, Dr. Faulkner, Taino, Dr. Sanders, and John Does 17-21 and Jane Doe 4, when Fowler learns their identities.

### 2. Supervisory Liability Defendants

Fowler separately states a colorable claim of supervisory liability against Dr. Minev.  I liberally construe the TAC as alleging that Dr. Minev instituted a policy prohibiting dentists employed by NDOC from either performing or recommending root canals.  As a direct result of this policy, Fowler has been unable to receive a medically necessary root canal.  These allegations are sufficient to state a supervisory liability claim against Dr. Minev.

Fowler fails to state a colorable supervisory liability claim against Dr. Faulkner and Hager.  Fowler alleges that Dr. Faulkner and Hager failed to properly perform their duties as outlined in AR 600.1.  This allegation does not give rise to an Eighth Amendment claim.  Fowler does not identify any policy instituted by Dr. Faulkner or Hager that was so deficient that the policy itself was a repudiation of constitutional rights.  As such, I dismiss any supervisory

1   liability claim against Dr. Faulkner and Hager based on the allegation that they failed to properly

2   perform their duties.

3          **F.  Count VI**

4          In Count VI, Fowler alleges that in April 2017, he had surgery on his leg to repair the

5   damage he inflicted while cutting a baseball-size hole in his leg. ECF No. 62 at 45.  On January

6   10, 2018, he filed a medical kite stating that the pain in that area had gotten worse, particularly

7   when he had to climb onto or off of his top bunk. *Id.*  Fowler filed another kite several months

8   later and received a response that he was scheduled. *Id.*  Fowler filed numerous other kites to

9   which he never received a response. *Id.*  Fowler then filed a kite on October 10, 2018, to which

10  he again received a response that he was scheduled and would be notified the day of his

11  appointment. *Id.*  Fowler filed another kite on November 16, 2018, and he received a response

12  stating that he was placed on the list to be seen. *Id.*

13         Fowler was finally seen by Dr. John Doe 16 on December 5, 2018. *Id.*  Dr. John Doe 16

14  prescribed Fowler pain medication and placed him on a bottom bunk restriction. *Id.*  Fowler

15  alleges that the delay in being seen was caused by John Doe 22, who responded to Fowler's kites

16  and failed to schedule appointments for him or a policy of understaffing. *Id.*  Specifically, Fowler

17  alleges that Dr. Minev and Hager established a policy under which there were only one or two

18  physicians at HDSP to treat more than 4,000 inmates. *Id.*  This policy led the 11-month delay in

19  Fowler being seen. *Id.*

20         Based on these allegations, Fowler asserts that Dr. Minev, Dr. Faulkner, Hager, and John

21  Doe 22 violated his rights under the Eighth Amendment and the Nevada Constitution.  None of

22  the allegations in Count VI concern Dr. Faulkner so I dismiss him from this claim without

23  prejudice.

### 1.  John Doe 22

Fowler states a colorable claim of deliberate indifference to his serious medical needs against John Doe 22.  I liberally construe the TAC as alleging that Fowler began experiencing significant leg pain in his surgically repaired leg.  Fowler filed numerous requests for medical attention, but John Doe 22 failed to schedule Fowler for a medical appointment for over 11 months.  As a result of the delay, Fowler continued to experience severe pain in his leg.  These allegations are sufficient to state a colorable claim on screening.

### 2.  Supervisory Liability Defendants

Fowler states a colorable claim of supervisory liability against Dr. Minev and Hager.  I liberally construe the TAC as alleging that Dr. Minev and Hager instituted a policy of having only one or two doctors at HDSP to care for over 4,000 patients.  As a direct result of this shortage of doctors, Fowler had to wait 11 months for a medical appointment for his leg pain. This delay caused Fowler to continue to suffer from severe leg pain for 11 months.  These allegations are sufficient to state a colorable claim on screening.

## G.  Count VII

In Count VII, Fowler alleges that he severely injured his hand just before his arrest, severing a tendon in his middle finger and a ligament in his index finger. ECF No. 62 at 47. Although the cuts were repaired with sutures, the internal damage was never addressed. *Id.* Fowler continued to experience moderate sporadic pain in his hand. *Id.*

In early to mid-2019, Williams ordered an increase in the pressure and duration of the pneumatically-actuated prison cell doors. *Id.*  The doors do not have either an automatic or manual safety shut-off. *Id.*  When the doors are obstructed, they remain fully pressurized for 30 seconds before slowly releasing air pressure, allowing an obstruction to be removed. *Id.*

In mid-June 2019, Fowler's left hand was caught in his cell door as it closed, further injuring it. *Id.*  Fowler pressed the intercom several times, but he was ignored, so he took some sleeping pills and went to sleep. *Id.*  On June 18, Fowler filed a kite requesting an appointment with an orthopedic specialist. *Id.*  After not receiving any response to his kite for 12 days, Fowler filed an emergency grievance and was told that he had been put on the urgent sick call list. *Id.*

Fowler continued to file grievances over this issue, and on July 12, 2019 Hubbard-Pickett denied Fowler's first level grievance, stating erroneously that Fowler had to file an informal grievance. *Id.*  Meanwhile, on July 8, 2019, Fowler was seen by Dr. Bryan. *Id.*  Dr. Bryan did not refer Fowler to an orthopedic specialist or provide any treatment for Fowler's hand. *Id.*  About a week later, Fowler was seen by Dr. Agustin about a different issue and mentioned his injured hand. *Id.*  Dr. Agustin ordered an X-ray but refused to provide Fowler any medication for his pain. *Id.*  John Doe 23 wrote a report on Fowler's X-ray discouraging treatment and attributing Fowler's injuries to the normal course of life and natural organ deterioration. *Id.*

On August 30, 2019, Fowler received Taino's denial of Fowler's informal grievance regarding treatment for his hand. *Id.*  On September 23, Dr. Bryan saw Fowler for an unrelated issue. *Id.*  Dr. Bryan declined to refer Fowler to an orthopedic specialist because Dr. Bryan believed that the URP would be more likely to approve the referral to a gastroenterologist if Dr. Bryan did not also refer Fowler to an orthopedic specialist. *Id.*  Dr. Bryan also declined to note the issue in Fowler's chart on the grounds that anyone could see that Fowler needed hand surgery. *Id.*  But Dr. Bryan prescribed the pain medication Fowler had been requesting for months. *Id.* at 49.

Over the next few months, Fowler's first and second level grievances were denied by Dr. Faulkner and Dr. Minev. *Id.*  Fowler continued to file requests for medical treatment and was

finally seen again by Dr. Bryan on March 19, 2020. *Id.*  This time, Dr. Bryan agreed to refer Fowler to an orthopedic specialist. *Id.*  The URP decided to continue to monitor Fowler's hand, rather than approving a referral to an orthopedic specialist. *Id.*

Based on these allegations, Fowler asserts that Dr. Minev, Dr. Faulkner, Taino, Hubbard-Pickett, Dr. Bryan, Dr. Agustin, URP, and John Doe 23 violated his rights under the Eighth Amendment and the Nevada Constitution by failing to provide him medical care.

Fowler states a colorable claim of deliberate indifference to a serious medical need.  I liberally construe the TAC as alleging that in June 2019, Fowler's hand was stuck in his cell door as it closed.  This significantly injured Fowler's already damaged hand, and as a result Fowler was in extreme pain.

Over the course of the next nine months, Fowler informed Dr. Minev, Dr. Faulkner, Taino, Hubbard-Pickett, Dr. Bryan, Dr. Agustin, the URP, and John Doe 23 either directly or through the grievance process about his need for surgery on his hand and the extreme pain he was in.  None of these defendants acted to ensure that Fowler received proper medical care for his hand, and the URP determined that Fowler should not receive surgery.  As a result, Fowler continues to be in pain on a daily basis.  These allegations are sufficient to state a colorable claim on screening.  This claim will proceed against Dr. Minev, Dr. Faulkner, Taino, Hubbard-Pickett, Dr. Bryan, Dr. Agustin, and the URP and John Doe 23 when Fowler learns their identities.

**H.  Count VIII**

In Count VIII, Fowler alleges that HDSP has been severely understaffed since he arrived in February of 2017. ECF No. 62 at 51.  NDOC employs only a single psychiatrist for roughly 13,000 inmates under a policy enacted by Dzurenda and Dr. Aranas and implemented and maintained by Dr. Minev, Hager, and Daniels. *Id.*  The psychiatrist spends only 20 hours a week

at HDSP, which houses 4,000 inmates. *Id.*  He is the only individual who can prescribe inmates psychotropic medications, which require frequent monitoring and adjustments. *Id.*

HDSP employs only two physicians and one nurse practitioner to treat the general medical needs of all 4,000 inmates at HDSP. *Id.* at 52.  As a result, inmates typically wait two to three months before being seen for a rushed visit. *Id.*  Because of this staffing shortage, Fowler had to wait for 11 months to initially be seen for his gastrointestinal issues. *Id.* at 53.  Fowler then had to wait several more months between each visit with medical personnel, and almost 2.5 before he received a colonoscopy. *Id.*  Fowler has also been waiting for over a year for treatment for his hand injury. *Id.*

HDSP is only allocated 2.5 dentists to treat 4,000 inmates. *Id.* at 54.  Often only 1.5 dentists are actually employed at HDSP. *Id.*  As a result, the average wait time to see a dentist is over two months.  On average, Fowler has had to wait longer than two months to see a dentist, causing various dental problems to persist for longer than they would if HDSP hired more dentists. *Id.*

Fowler has asked for medical staff to be hired. *Id.*  Although Dr. Faulkner does not have the authority to hire medical staff, his position requires him to "make every effort" to ensure adequate medical resources are available at HDSP, and he has not done so. *Id.*  Buen and Taino also do not have the authority to hire medical staff, but they were aware of chronic delays and failed to recommend that additional medical staff be hired. *Id.*  Former Governor Brian Sandoval, and former Director James Dzurenda have been aware that HDSP's medical staff deficiencies cause excessive delays since 2017 when a different inmate sued them over excessive delays in receiving medical treatment. *Id.*

Based on these allegations, Fowler alleges that Dr. Minev, Hager, Dr. Aranas, Dr. Faulkner, Buen, Taino, Dzurenda, Daniels, and Sandoval violated his right to adequate medical care under the Eighth Amendment and the Nevada Constitution.

Fowler states a colorable claim of deliberate indifference to a serious medical need against Dzurenda and Sandoval.  I liberally construe the TAC as alleging that Dzurenda and Sandoval were aware of policies limiting medical personnel at HDSP and either tacitly or directly signed off on those policies.  The policies limiting medical personnel at HDSP directly led to Fowler receiving inadequate or significantly delayed medical care, which led to ongoing pain and suffering.  These allegations are sufficient to state a colorable claim on screening.  This claim will proceed against Dzurenda and Sandoval.

Fowler fails to state any other new colorable claims in Count VIII.  The allegations in Count VIII are largely duplicative of allegations in previous counts.  For example, in Section II(A)(2), I found that Fowler stated a colorable supervisory liability claim based on the allegation that Dr. Minev, Dr. Aranas, Dzurenda, Daniels, and Hager instituted or enforced a policy that NDOC should only employ a single psychiatrist.  In Count VIII, Fowler again alleges that these Defendants instituted or enforced this policy and appears to attempt to bring the same claim already addressed in Section II(A)(2).

Similarly, Fowler alleges delays in receiving treatment for his gastrointestinal issues, treatment with his hand, and dental treatment.  But Fowler does not explain how these claims differ from the same allegations in previous counts, which I have already addressed.  Nor does Fowler explain which defendants were responsible for these delays.  As such, Fowler does not state any new colorable claims based on these allegations.

Fowler also tries to bring a claim based on the allegation that Dr. Faulkner failed in his job duty to make every effort to ensure adequate medical resources at HDSP.  I already discussed and dismissed similar claims in Sections II(B)(2) and II(E)(2), and Fowler does not explain how this claim is any different from his previous claims.  Finally, Fowler also attempts to hold Buen and Taino generally liable for the delays in treatment because they were on notice of excessive delays caused by staffing shortages.  I already discussed these defendants to the extent that Fowler alleged that they were aware of any of his medical needs in previous counts, and Fowler does not include any new allegations about them.  As such, Fowler does not state any new colorable claims based on these allegations.

## I.   Counts IX-XI

In Counts IX-XI, Fowler brings several claims based on his attempts to receive a diet that aligns with his religious beliefs.  Because these claims are based on the same set of facts, I will consider them together.  Fowler alleges that his spiritual beliefs do not fit neatly into any particular religion. ECF No. 62 at 57.   However, based on the options available to him, Fowler formally declared his religious affiliation as "Thelema" about two years ago, and he has been attending weekly chapel services ever since. *Id.*  Fowler's religious beliefs are eclectic, and among his beliefs is that he should not eat the flesh of sentient organisms and that he must eat a diet rich in fruits and vegetables, rather than junk food. *Id.*  Fowler's religious beliefs also require him to meditate regularly, and the lack of nutrition in NDOC's standard diet inhibits his mediation. *Id.* at 57-58.

In July 2018, Fowler requested to be put on a vegan diet, but his requests were ignored and he gave up trying. *Id.* at 58.  However, in February 2019, Fowler decided to request to be placed on the common fare diet. *Id.*  Although the common fare diet was not a perfect match for

31

his religious beliefs, it was far better than the standard diet. *Id.* Fowler submitted a common fare application packet to Chaplain Calderin on February 22, 2019. *Id.* On March 8, Calderin informed Fowler that his request had been processed without elaborating further. *Id.* Fowler filed a grievance over the issue, and Hubbard-Pickett denied the grievance based on a technicality. *Id.* at 59. Fowler refiled his grievance. *Id.*

On April 12, 2019, Calderin told Fowler that his application for the common fare diet had been lost and that Fowler would have to file a new one, which Fowler did. *Id.* After receiving the new application, Calderin interviewed Fowler regarding the sincerity of his beliefs and told Fowler that Calderin would need to get approval from "Carson City," which was a reference to NDOC headquarters. *Id.* Through April and early May, Calderin continued to require Fowler, as well as two other Thelemites, to provide various forms of evidence of their religious need for the common fare diet before ultimately agreeing to put them on the common fare diet and admitting that he did not actually need approval from Carson City. *Id.* Finally, on June 19, 2019, Fowler was officially approved for the common fare diet. *Id.*

Calderin refers to adherents of pagan religions such as Thelema as devil worshippers. *Id.* at 62. Calderin told Fowler that he believes that only Jews should be eligible for the common fare diet. *Id.* Calderin assists individuals who practice a religion that he tolerates with signing up for the common fare diet, but he obstructed Fowler and other Thelemites from approval for a common fare diet. *Id.* Former Governor Brian Sandoval and former Director Dzurenda have known that Calderin discriminates against non-Abrahamic religions since at least 2017, when they were sued in a lawsuit alleging such discrimination. *Id.* at 61.

Even after Fowler was placed on the common fare diet, he continued to file grievances because the meals that he received often did not correspond to the official common fare menu.

1    *Id.* at 60.  Fowler's non-meat meals were replaced with tuna, which was often rancid, or lunch

2    meat several times each week. *Id.*  As a result, Fowler had to go hungry or eat something that

3    violated his religious beliefs. *Id.*  The failure to serve proper common fare meals was caused by

4    Mr. Wilson, who oversees culinary and has been reprimanded numerous times by the rabbi who

5    oversees the common fare menu.  Fowler informed Wilson, Hubbard-Pickett, and Wickham

6    about the problems with the food he was receiving, but none of them bothered to investigate. *Id.*

7         Based on these allegations, Fowler alleges that Calderin, Hubbard-Pickett, Wickham,

8    Wilson, Dzurenda, and Sandoval violated his right to free exercise of religion under the First

9    Amendment, and Article 1, Section 4 of the Nevada Constitution[5] (Count IX) and the Religious

10   Land Use and Institutionalized Persons Act of 2000 (RLUIPA) (Count XI).  Fowler also alleges

11   that Defendant Calderin violated his right to equal protection under the Fourteenth Amendment

12   (Count X).

13        **1.  First Amendment and RLUIPA**

14             **a.  Defendants Calderin, Hubbard-Pickett, Wickham, and Wilson**

15        The First Amendment to the United States Constitution provides that Congress shall

16   make no law respecting the establishment of religion or prohibiting the free exercise thereof.

17   U.S. Const. amend. I.  Inmates retain protections afforded by the First Amendment, "including

18   its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*,

19   482 U.S. 342, 348 (1987).  "In general, a plaintiff will have stated a free exercise claim if:

20

21   [5] Article 1, Section 4 of the Nevada Constitution provides that "[t]he free exercise and enjoyment
     of religious profession and worship without discrimination or preference shall forever be
22   allowed" in Nevada."  "The U.S. District Court for the District of Nevada twice has indicated
     that Nevada's [free exercise of religion] provision is co-extensive with the First Amendment."
23   *Martinez v. Clark Cty., Nev.*, 846 F. Supp. 2d 1131, 1145 (D. Nev. 2012).  For purposes of
     screening, I will assume that the protections provided by the First Amendment and the Nevada
     Constitution's free exercise of religion provision are the same.

1  (1) 'the claimant's proffered belief [is] sincerely held; and (2) 'the claim [is] rooted in religious

2  belief, not in purely secular philosophical concerns.'" *Walker v. Beard*, 789 F.3d 1125, 1138 (9th

3  Cir. 2015).  "[L]imitations on the exercise of constitutional rights arise both from the fact of

4  incarceration and from valid penological objectives–including deterrence of crime, rehabilitation

5  of prisoners, and institutional security." *Id*.  During summary judgment, courts evaluate prison

6  regulations alleged to infringe on constitutional rights under the "reasonableness" test set forth in

7  *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). *Shabazz*, 482 U.S. at 349; *see Hrdlicka v. Reniff*,

8  631 F.3d 1044, 1046-50 (9th Cir. 2011) (analyzing the *Turner* factors applied during summary

9  judgment on appeal).

10      RLUIPA provides in relevant part:

11      No government shall impose a substantial burden on the religious exercise of a
        person residing in or confined to an institution . . . unless the government
12      demonstrates that imposition of the burden on that person–(1) is in furtherance of
        a compelling governmental interest; and (2) is the least restrictive means of
13      furthering that compelling governmental interest.

14  42 U.S.C. § 2000cc-1(a)(1)-(2).  "Claims brought under RLUIPA are subject to a strict scrutiny

15  standard, which replaces the reasonableness standard employed in cases involving constitutional

16  violations." *Shilling v. Crawford*, 536 F.Supp.2d 1227, 1232 (D. Nev. 2008).

17      RLUIPA broadly defines "religious exercise" as "any exercise of religion, whether or not

18  compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "RLUIPA

19  is to be construed broadly in favor of protecting an inmate's right to exercise his religious

20  beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (citing 42 U.S.C.A. §

21  2000cc-3(g)).  The plaintiff bears the burden of demonstrating a prima facie claim that the

22  prison's policies or actions constitute a substantial burden on the exercise of his religious beliefs.

23  *Id*. at 994.

1    Fowler states colorable claims under the First Amendment and RLUIPA.  I liberally

2  construe the TAC as alleging that Fowler is a practitioner of Thelema.  Fowler's religious beliefs

3  require that he not eat the flesh of sentient organisms and that he eats a diet rich in fruits and

4  vegetables, rather than junk food.  Fowler requested to be placed on the common fare diet, which

5  does not perfectly match with his religious needs, but is much closer than the standard NDOC

6  diet.  Calderin deliberately obstructed Fowler's attempts to be placed on the common fare diet

7  because of his personal dislike of pagan religious.  Dzurenda and Sandoval knew that Calderin

8  discriminates against non-Abrahamic religions, but they did nothing to prevent him from

9  continuing his discrimination.  As a result of Calderin's actions, there was a significant delay

10  before Fowler was placed on the common fare diet.

11    After being placed on the common fare diet, Fowler continued to receive food that did

12  not comport with the requirements of the common fare diet.  Fowler informed Wilson, Hubbard-

13  Pickett, and Wickham that he was not receiving proper common fare meal, but none of them

14  acted to correct the issue.  As a result, Fowler had to choose between going hungry and eating

15  food that violated his religious beliefs.  These allegations are sufficient to state a colorable claim

16  on screening.  This claim will proceed against Calderin, Dzurenda, Sandoval, Hubbard-Pickett,

17  Wickham, and Wilson.

18    **b.  Defendant State of Nevada ex rel. NDOC**

19    Fowler also indicates that he would like to pursue a RLUIPA claim against the State of

20  Nevada ex rel. NDOC, and he is unsure why I dismissed this claim in the previous screening

21  order. ECF No. 62 at 63.  Fowler argues in a motion for reconsideration that by accepting federal

22  funding, the State of Nevada has waived its Eleventh Amendment sovereign immunity for

23  RLUIPA purposes. ECF No. 57 at 6.

Sovereign immunity may be waived, but the waiver "must be 'unequivocally expressed' in the text of the relevant statute." *Sossamon v. Texas*, 563 U.S. 277, 28, (2011) (quoting *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, (1984)). "States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver." *Sossamon*, 563 at 293. As such, Nevada has not waived its sovereign immunity with respect to RLUIPA, and Fowler cannot bring a RLUIPA claim against the state. The State of Nevada ex rel. NDOC is dismissed from this claim with prejudice, as amendment would be futile.

### 2. Equal Protection Claim

Fowler also asserts an equal protection claim. The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all similarly situated persons be treated equally under the law. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In order to state an equal protection claim, a plaintiff must allege facts demonstrating that defendants acted with the intent and purpose to discriminate against him based upon membership in a protected class, or that defendants purposefully treated him differently than similarly situated individuals without any rational basis for the disparate treatment. *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Fowler states a colorable equal protection claim. I liberally construe the TAC as alleging that Calderin routinely refers to adherents of pagan religions, including Thelema, as devil worshippers. Calderin intentionally obstructed Fowler's attempts to be placed on a common fare diet because of Calderin's dislike of practitioners of Thelema. These allegations are sufficient to state a colorable claim on screening. This claim will proceed against Calderin.

1    **J.   Count XII**

2        In Count XII, Fowler alleges that the chapel at HDSP has been closed for six months due

3    to COVID-19. ECF No. 62 at 64.  But many other services at HDSP continue to allow gatherings

4    of inmates. *Id.*  There are fewer than 25 members of Thelema at HDSP, and they gather outside

5    in a large backyard chapel to study, worship, and have ceremonies. *Id.*  The gatherings satisfy

6    Nevada's COVID-19 mandates.  Fowler has filed three grievances over closure of the chapel. *Id.*

7    Calderin and Calvin Johnson have denied Fowler's grievances.

8        Based on these allegations, Fowler brings claims against Calderin, Calvin Johnson, and

9    the State of Nevada ex rel. NDOC.[6]  Fowler alleges that the defendants violated his right to free

10   exercise of religion under the First Amendment and Article 1, Section 4 of the Nevada

11   Constitution and violated RLUIPA.

12       Fowler states colorable claims under the First Amendment and RLUIPA.  I liberally

13   construe the TAC as alleging that as part of Fowler's religious practice he needs to gather in a

14   large outdoor chapel to study, worship, and conduct religious ceremonies.  NDOC officials have

15   denied Fowler the ability to participate in this outdoor worship.  These allegations are sufficient

16   to state a colorable claim on screening.  This claim will proceed against Calderin and Calvin

17   Johnson.

18       Fowler also attempts to bring a RLUIPA claim against the State of Nevada ex rel.

19   NDOC.  As discussed in Section II(J)(1), Fowler cannot bring a RLUIPA claim against the State,

20   so I dismiss the State of Nevada from this claim with prejudice, as amendment would be futile.

21   / / / /

22   / / / /

23

---

[6] Fowler names the State of Nevada ex rel. NDOC only in relation to his RLUIPA claim.

### K.  Count XIII-XV

In Counts XIII-XV, Fowler brings several claims based on a lack of outdoor exercise. Fowler alleges that since arriving at HDSP, he has been subject to schedules that call for an average of 3 hours and 58 minutes of outdoor exercise and 12 hours and 50 minutes of indoor recreation time per week. ECF No. 62 at 66.  However, Fowler has received significantly less time than that as the scheduled time is often delayed, terminated early, or cancelled. *Id.*  Fowler has actually received an average of 23 minutes per day of outdoor exercise (a little under 3 hours per week) and 75 minutes per day of indoor recreation time (just under 9 hours per week).  This includes a period of 72 straight days in 2017 when Fowler was not allowed out of his cell. *Id.* Since Williams became warden of HDSP, the prison has averaged 50 lockdowns a year, greatly reducing inmates' time out of their cells. *Id.*  As a result of these conditions, Fowler's severe mental health issues have gotten worse, he has experienced muscle atrophy, and he attempted suicide. *Id.*

Fowler filed an informal grievance over the issue in February 2019, and Lozano denied his grievance. *Id.*  Fowler then filed a first level grievance, which Hubbard-Pickett rejected. *Id.* Shortly thereafter, John Doe 10 ordered Fowler moved to the hole, without any precipitating event and without consulting mental health providers at HDSP. *Id.*  While in the hole, Fowler was locked in his cell for 24 hours each day. *Id.*

In September 2019, Fowler sent a kite to Hubbard-Pickett, explaining the problems with yard and tier time, but she never responded. *Id.*  In January 2020, after Fowler had been placed in unit 11, Fowler decided to file another informal grievance about the lack of exercise. *Id.* at 67. Sergeant V. Thompson denied that grievance. *Id.*  Fowler then filed a first level grievance, which was eventually denied by Calvin Johnson. *Id.*

Meanwhile, In February 2020, Williams altered the schedule to reduce Fowler's scheduled outdoor time from 5 hours a week to 3 hours a week, and his indoor recreation time from 12 hours a week to 11 hours a week. *Id.*  In March 2020, Bean further reduced the scheduled to 1 hour of outdoor time per week and 7 hours of indoor recreation per week. *Id.* Fowler filed a second level grievance in May 2020, which Wickham denied. *Id.*

Dzurenda, Sandoval, and Sisolak have been aware of the inadequate yard time since they were sued by other prisoners bringing similar allegations. *Id.*  Protective segregation inmates such as Fowler have not received a single hour of yard time since May 19, 2020. *Id.*

Based on these allegations, Fowler asserts that Calvin Johnson, Williams, Wickham, Bean, Lozano, V. Johnson, John Doe 10, Dzurenda, Sandoval, and Sisolak violated his rights under the Eighth Amendment, and Article 1, Section 6 of the Nevada Constitution (Count XIII), that Wickham and Williams violated his right to equal protection under the Fourteenth Amendment (Count XIV), and that Wickham, Williams, and the State of Nevada ex rel. NDOC violated his rights under the ADA and RA.

### 1.  Eighth Amendment

"Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation." *Keenan v. Hall*, 83 F.3d 1083,1089 (9th Cir. 1996).  However, "a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997).  Prison officials may restrict outdoor exercise on the basis of weather, unusual circumstances, or disciplinary needs. *See Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979). "The cost or inconvenience of providing adequate [exercise] facilities[, however,] is not a defense to the imposition of a cruel punishment." *Id.* at 200.

Fowler states a colorable Eighth Amendment claim based on his limited time for outdoor and indoor exercise.  I liberally construe the TAC as alleging that Fowler has had severely restricted access to outdoor and indoor exercise.  He has had an average of 23 minutes per day of outdoor exercise and 75 minutes per day of indoor tier time.  Fowler often receives no outdoor exercise or indoor tier time for extended periods.  Fowler has serious mental health needs, and the lack of outdoor exercise significantly exacerbates Fowler mental health issues.  The lack of outdoor exercise significantly contributed to a serious suicide attempt in which Fowler cut a baseball-size hole in his thigh.  The lack of outdoor exercise has also cause Fowler to suffer from muscle atrophy.  Fowler informed Hubbard-Pickett, Lozano, sergeant V. Johnson, and Calvin Johnson about his need for outdoor exercise, but none of them acted to correct the issue. Dzurenda, Sandoval, and Sisolak have also been made aware of the ongoing lack of yard time at HDSP as the result of various lawsuits against them.  These allegations are sufficient to state a colorable claim on screening.  This claim will proceed against Hubbard-Pickett, Wickham, Lozano, Sergeant V. Johnson, Calvin Johnson, Dzurenda, Sandoval, and Sisolak.

Fowler states a colorable supervisory liability claim against Williams and Bean based on their decisions to implement policies restricting yard time.  I liberally construe the TAC as alleging that Williams was generally responsible for setting the outdoor exercise schedules for inmates over the past several years.  Williams put policies in place limiting outdoor exercise time for inmates and called for frequent lockdowns of the prison, further limiting outdoor exercise time.  More recently, Williams and Bean have each been responsible for further reducing the scheduled outdoor exercise time and indoor recreation time.  Based on these allegations, each of these defendants has implemented policies that were directly responsible for limiting Fowler's

exercise time.  These allegations are sufficient to state a colorable supervisory liability claim on screening.  This claim will proceed against Williams and Bean.

Fowler fails to state a colorable claim against John Doe 10.  The only allegation about John Doe 10 is that John Doe 10 ordered that Fowler be moved to the hole, where he did not receive any outdoor time or tier time.  Fowler does not allege that John Doe 10 had any responsibility for the amount of outside exercise time or inside tier time that Fowler received while in the hole, or Fowler ever informed John Doe 10 of his need for yard time.  As such, the TAC fails to state a colorable claim against John Doe 10, so I dismiss this claim against John Doe 10 without prejudice.

### 2.  Equal Protection Claim

Fowler fails to state a colorable equal protection claim.  Fowler alleges that inmates at other prisons receive vastly more yard time than inmates at HDSP. ECF No. 62 at 68.  Williams used to work a different medium security prison, where he gave inmates several hours of outdoor exercise a day. *Id.*  But once Williams started working at HDSP, he dramatically reduced inmates' yard and tier time.  Wickham ratified this conduct by denying Fowler's grievance. *Id.*

Fowler fails to state a colorable equal protection claim.  He is not similarly situated to inmates at other prisons.  As such, he cannot state an equal protection claim based on the allegation that different prisons have different policies regarding yard time.  I dismiss this claim with prejudice, as amendment would be futile.

### 3.  ADA and RA

Fowler argues that the policy of limiting yard time has a disparate impact on him because he suffers from depression, anxiety, and OCD, which are exacerbated by the lack of outdoor time. ECF No. 62 at 15.  The ADA says that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132.  The RA says that "[n]o otherwise qualified individual with a

disability in the United States . . . shall, solely by reason of her or his disability, be excluded

from the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  Under the ADA,

individuals may challenge a facially neutral government policy on the ground that it has a

disparate impact on people with disabilities. *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725

F.3d 1088, 1102 (9th Cir. 2013).  In order to support such a claim, a plaintiff must demonstrate

that the policy has the "effect of denying meaningful access to public services." *Id.*  For example,

a law banning elevators in government buildings would be facially neutral but would have the

effect of denying people confined to wheelchairs meaningful access to various governmental

services.

Fowler does not allege that he has been denied meaningful access to public services that

are provided to other inmates.  Rather, Fowler appears to allege that all inmates receive

inadequate outdoor yard time and that has the exact same inadequate access to outdoor yard time

as non-disabled inmates.  Fowler alleges that he needs more outdoor yard time because the lack

of outdoor yard time negatively impacts his mental health issues.  This amounts to an argument

that he needs additional outdoor yard time to treat his medical conditions, not that he has been

denied access to a public service.  As discussed in Section II(C)(2), the ADA and the RA do not

provide a claim for a failure to treat a disability.  As such, I dismiss Fowler's ADA and RA

claims without prejudice.

/ / / /

1  **L.  Count XVI**

2        In Count XVI, Fowler alleges that HDSP suffers from a myriad of unsanitary conditions.

3  ECF No. 62 at 71.  Until 2019, inmates never received cleaning supplies for their cells. *Id.*  Now,

4  if an inmate is sufficiently persistent, a staff member may provide him a portion of a green

5  scrubbing pad and a tablespoon of powdered cleaning chemicals, but nothing else is provided. *Id.*

6  Mops are not provided, nor are toilet brushes. *Id.*  No soap or hand sanitizer is provided in the

7  dayroom or the kitchens. *Id.*  Common areas are rarely cleaned and only cleaned with water or

8  overly diluted chemical solution. *Id.*  Inmates who serve food are rarely required to wear hairnets

9  or to change their gloves when shifting from cleaning to serving food. *Id.*  Until October of 2019,

10  general population inmates were responsible for preparing the food for protective custody

11  inmates, such as Fowler, and they would put rocks, urine, semen, and in at least one instance rat

12  poison, in the food. *Id.*  Fowler believes that general population inmates have again been given

13  the responsibility for preparing food for protective custody inmates. *Id.*  The showers often have

14  feces in the drain because bathroom access is not provided during yard time or tier time. *Id.*

15  There is no ability to clean shared items such as phones, tables, or microwaves. *Id.*

16        Fowler filed several grievances over these issues. *Id.* at 72.  Hubbard-Pickett, Lozano,

17  Williams, and Wickham each denied Fowler's grievances over these issues. *Id.*  Barth

18  interviewed Fowler about his second level-grievances and wrote the denial response for

19  Wickham. *Id.*  Williams acknowledged that prior to 2019 sanitation had not been "up to

20  standard," but he did not address any of the ongoing sanitation issues. *Id.*  Dzurenda, Sandoval,

21  and Sisolak have been made aware of the problems with sanitation through various lawsuits filed

22  against them. *Id.*  Based on these allegations, Fowler alleges that Williams, Hubbard-Pickett,

23

43

1  Barth, Lozano, Wickham, Sandoval, Dzurenda, and Sisolak violated the Eighth Amendment and
2  Article 1, Section 6 of the Nevada Constitution. *Id.* at 70.

3      The "treatment a prisoner receives in prison and the conditions under which he is
4  confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S.
5  25, 31 (1993).  Conditions of confinement may, consistent with the Constitution, be restrictive
6  and harsh. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  However, "[p]rison officials have a
7  duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical
8  care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).  When
9  determining whether the conditions of confinement meet the objective prong of the Eighth
10 Amendment analysis, the court must analyze each condition separately to determine whether that
11 specific condition violates the Eighth Amendment. *See Wright v. Rushen*, 642 F.2d 1129, 1133
12 (9th Cir. 1981).

13     As to the subjective prong of the Eighth Amendment analysis, prisoners must establish
14 prison officials' "deliberate indifference" to the unconstitutional conditions of confinement to
15 establish an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  When
16 considering the conditions of confinement, the court should consider the amount of time to
17 which the prisoner was subjected to the condition. *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th
18 Cir. 2005).  "[S]ubjection of a prisoner to lack of sanitation that is severe or prolonged can
19 constitute an infliction of pain within the meaning of the Eighth Amendment." *Anderson v. Cnty.*
20 *of Kern*, 45 F.3d 1310, 1314, *opinion amended on denial of reh'g*, 75 F.3d 448 (9th Cir. 1995).

21     Fowler states a colorable conditions of confinement claim based on the lack of sanitation.
22 I liberally construe the TAC as alleging that HDSP had a myriad of ongoing unsanitary
23 conditions, including feces in shower drains, food contaminated with semen, urine, and rocks,

1   and a failure to clean the prison or provide inmates the means to do so.  Fowler informed

2   Hubbard-Pickett, Lozano, Williams, Wickham, and Barth about the unsanitary conditions in

3   HDSP through the grievance process.  Dzurenda, Sandoval, and Sisolak were also made aware of

4   the ongoing sanitation problems at HDSP through various lawsuits.  None of the defendants

5   acted to remedy the ongoing sanitation problems.  These allegations are sufficient to state a

6   colorable claim on screening.  This claim will proceed against Hubbard-Pickett, Lozano,

7   Williams, Wickham, Barth, Dzurenda, Sandoval, and Sisolak.

8       **M. Count XVII**

9       In Count XVII Fowler alleges that on March 22, 2019, while the inmates were on the tier,

10  Fowler asked Cooper to let him into his cell so that he could use the restroom. ECF No. 62 at 74.

11  It only would have taken Cooper a few seconds to press a button to open Fowler's cell door and

12  another second to close it behind him, but she refused to do so, and as a result Fowler urinated in

13  his pants. *Id.*  This was humiliating and resulted in an unpleasant odor in Fowler's cell as Fowler

14  did not have the means to properly clean his pants. *Id.*  According to prison policy, inmates

15  should be allowed back into their cells during tier time to use the restroom. *Id.*

16      That night, Fowler filed a grievance over the issue. *Id.*  In April 2019, Roberson

17  interviewed several inmates who witnessed this incident, and they all confirmed Fowler's

18  allegations. *Id.*  Nonetheless, Roberson denied Fowler's grievance. *Id.*  Fowler continued the

19  grievance process and noted that this issued was not limited to Cooper but occurred with

20  numerous guards. *Id.*  Hubbard-Pickett, Williams, and Delporto all denied grievances. *Id.*

21      Because Hubbard-Pickett, Williams, and Delporto did not act to ensure that the prison

22  policy was properly followed, Fowler continued to be denied access to use his cell's restroom on

23  numerous occasions. *Id.* at 75.  On one occasion, Fowler defecated in his pants as a result of a

45

guard's refusal to allow him to use the restroom. *Id.*  Based on these allegations, Fowler asserts

that Cooper, Roberson, Delporto, Williams, and Hubbard-Pickett violated his rights under the

Eighth Amendment and the Nevada Constitution. *Id.* at 73.

### 1.   Defendant Cooper

Fowler states a colorable conditions of confinement claim against Cooper.  I liberally

construe the TAC as alleging that NDOC regulations require officers to let inmates into their

cells so that they can use the bathroom during tier time.  The system is set up so that an officer

only needs to touch a button to allow an inmate into his cell and then close the cell door behind

the inmate.  Fowler informed Cooper that he desperately needed to use the bathroom and asked

her to open his cell door for him, but she refused.  As a result, Fowler urinated in his pants.

Although this alleged denial of bathroom access was brief, it was arguably severe and

wholly unnecessary.  As such, Fowler states a colorable claim for the purposes of screening.

This claim will proceed against Cooper.

### 2.   Defendants Roberson, Hubbard-Pickett, Williams, and Delporto

Fowler states a colorable supervisory liability claim against Roberson, Hubbard-Pickett,

Williams, and Delporto.  I liberally construe the TAC as alleging that each of these defendants

denied Fowler's grievances about the fact that Cooper and other guards refused to allow inmates

into their cells to use the restroom during tier time, including once occasion in which Fowler

defecated in his pants.  These allegations are sufficient to state a colorable claim on screening.

This claim will proceed against Roberson, Delporto, Williams, and Hubbard-Pickett.

/ / / /

/ / / /

/ / / /

### III.   FOWLER'S MOTIONS

#### A.  ECF Nos. 8 and 9

Fowler filed two motions asking for permission to file documents via the United States Post office rather than through the e-filing system. ECF Nos 8, 9.  Fowler's first motion indicated that he had already mailed the documents before he was informed of the rule requiring e-filing. ECF No. 8.  Fowler's second motion indicated that HDSP had never actually sent his mail and that he would try to e-file it but requested permission to file by mail if he was unable to e-file his documents. ECF No. 9.  Since filing those motions, he has successfully filed numerous documents.  As such, it appears that Fowler is successfully utilizing the e-filing system, so I deny both of Fowler's motions without prejudice.

#### B.  ECF Nos. 11 and 14

Fowler filed a motion for permission to add pages to the form complaint and submit the new document as his first amended complaint. ECF No. 11.  Fowler also filed a motion requesting permission to file a memorandum in support of his first amended complaint. ECF No. 14.  I screened Fowler's first amended complaint and dismissed it in its entirety on May 1, 2020. ECF No. 18.  As such, I deny Fowler's motions as moot.

#### C.  ECF No. 25

Fowler filed a motion for permission to add pages to the form complaint and submit the new document as his second amended complaint. ECF No. 25.   I screened Fowler's second amended complaint on July 6, 2020. ECF No. 41.  As such, I deny this motion as moot.

#### D.  ECF No. 26

Fowler requested that I take judicial notice of a previous case, *Ross v. Sandoval*, 2:17-CV-02386-APG-GWF (D. Nev 2017).  Fowler argues that his case is similar to *Ross* and that his

1  claims should allowed to proceed as the claims in *Ross* were allowed to proceed.  I am aware of

2  *Ross*.  But for Fowler's benefit, differences in factual allegations between the cases or changes in

3  the law may require different outcomes.  Fowler's motion for the Court to take judicial notice is

4  denied as moot.

5       **E.  ECF Nos. 48 and 50**

6       In my order screening Fowler's second amended complaint, I ordered the Clerk of the

7  Court to send Fowler a courtesy copy of the second amended complaint, as well as a §1983

8  complaint form and documents to file a new application to proceed *in forma pauperis*. ECF No.

9  41 at 42-45.  Fowler filed a motion stating that he had not received these documents and asking

10 that they be resent if necessary. ECF No. 48.  Fowler subsequently filed a motion indicating that

11 he had received some, but not all the documents. ECF No. 50.  Since filing these motions,

12 Fowler has submitted the TAC and a new application to proceed *in forma pauperis*.  As such, it

13 appears that Fowler received the documents he needed, so his motions are denied as moot.

14      **F.  ECF Nos. 56 and 57**

15      Fowler has filed two motions regarding reconsideration of my screening order on his

16 second amended complaint. ECF Nos. 56 and 57.  Fowler first requests that he be given an

17 extension to file a new motion for reconsideration regarding the dismissal of his state law tort

18 claims. ECF Nos 56. at 1, 57 at 1-2.  Fowler asked for a 60-day extension and permission to

19 continue requesting extension until he has better access to the law library. ECF No. 57 at 2.  I

20 cannot place this matter on hold indefinitely so I deny this request. To the extent Fowler believes

21 he has a basis to reassert his state law claims at some point in the future, he may file a motion to

22 amend his complaint at that time.

23

Fowler next argues that although I properly dismissed his ADA and RA claims, I should

have dismissed them without prejudice, rather than with prejudice. ECF No. 57 at 2-6. Fowler

cites to a variety of cases from the First and Second Circuits to argue that the denial of his

medication can give rise to an ADA claim. As an initial matter, precedent from the First and

Second Circuits is not binding in this circuit. The Ninth Circuit has held that "the ADA prohibits

discrimination *because of disability*, not inadequate treatment for disability." *Simmons*, 609 F.3d

at 1022 (emphasis added).

The cases from other circuits that Fowler cites to deal with allegations that medical

treatment was so inadequate that it gave rise to an inference that there was a discriminatory

motive behind the lack of treatment. *See Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274,

285 (1st Cir. 2006). Fowler does not allege any facts in either the second amended complaint or

the TAC that support that the lack of medical treatment was based on a discriminatory motive.

To the contrary, Fowler appears to assert that the 23-day delay in receiving his medication was

due to staffing shortages, not any discriminatory intent. Beyond that delay, Fowler appears to

attribute other delays to staffing shortage or individual laziness by various defendants. However,

I am cognizant that Fowler is proceeding *pro se* and may have difficulty articulating the facts of

his case. As such, I grants Fowler's request to have his ADA claims dismissed without

prejudice, rather than with prejudice.

Finally, Fowler requests that I reconsider the dismissal of the State of Nevada ex rel

NDOC with prejudice from the entirety of this case. Fowler argues that he should be able to

bring claims against the State of Nevada ex rel NDOC under RLUIPA, and under the ADA if

Fowler can state a colorable ADA claim. I grant Fowler's motion as it relates to the ADA.

However, as discussed in Section II(I)(1), the States have not waived their Eleventh Amendment

1   immunity as it applies to RLUIPA, and Fowler cannot bring a RLUIPA claim against the State of

2   Nevada.

3       **G.  ECF Nos. 63 and 64**

4           Fowler filed a motion indicating that the exhibits that he attached to the TAC were

5   improperly filed as being part of the TAC. ECF No. 63.  Fowler requests that ECF No. 62 be

6   modified to include only his TAC and attached exhibits be included as attachments.  The docket

7   has been modified and ECF No. 62 now includes only the TAC.  The exhibits that were

8   previously included in ECF No. 62 are now filed at ECF No. 70, and Fowler's exhibits are now

9   labeled as exhibits rather than as part of the TAC.  As such, I deny this motion as moot.

10          Fowler also filed a motion stating that he requested that the law library file the TAC on

11  August 9 (one day before the August 10 deadline for him to file it), but the document was not

12  filed until August 11. ECF No. 64.  Fowler asks that I either correct the filing date or grant him

13  an extension and accept the TAC. *Id.*  I grant the extension and accept the TAC.

14      **H.  ECF No. 73**

15          Fowler filed a motion indicating that he simultaneously filed an electronic letter to me

16  and mailed the letter directly to me.  Both copies have been filed by the Clerk of the Court,

17  resulting in a duplicate file.  Fowler requests that the second filing, ECF No. 72 be stricken from

18  the record.  Fowler's motion is granted.

19  **IV.    CONCLUSION**

20          I order that the TAC (ECF No. 62) is the operative complaint in this case.  The Clerk of

21  the Court will send Fowler a courtesy copy of the TAC.

22          I further order that Fowler's claim in Count I of deliberate indifference to a serious

23  medical need, and his corresponding Nevada State Constitutional claim, will proceed against Dr.

Minev, Hubbard-Pickett, Buen, Dr. Faulkner, Dolphin, Dr. Aranas, Dzurenda, Daniels and Hager and John Does 1-14 and Jane Does 1-3 when Fowler learns their identities

I further order that Fowler's claim in Count II of deliberate indifference to a serious medical need, and his corresponding Nevada State Constitutional claim, will proceed against Buen, Dr. Faulkner, Dr. Minev, Hubbard-Pickett, Dzurenda, Daniels and Hager and John Doe 15 when Fowler learns his identity.

I further order that Fowler's Eighth Amendment claim in Count III, and his corresponding Nevada State Constitutional claim, will proceed against Dolphin.

I further order that Fowler's ADA and RA claims in Count III are dismissed without prejudice.

I further order that Fowler's claim in Count IV of deliberate indifference to a serious medical need, and his corresponding Nevada State Constitutional claim, will proceed against Hubbard-Pickett, Dr. Bryan, Dr. Agustin, Buen, Dr. Faulkner, Dr. Minev, and the URP and Dr. John Doe 16, when Fowler learns their identities.

I further order that Fowler's claim in Count V of deliberate indifference to a serious medical need, and his corresponding Nevada State Constitutional claim, will proceed against Dr. Minev, Dr. Faulkner, Taino, Dr. Sanders, and John Does 17-21 and Jane Doe 4, when Fowler learns their identities.

I further order that Fowler's claim in Count VI of deliberate indifference to a serious medical need, and his corresponding Nevada State Constitutional claim, will proceed against Dr. Minev, Hager, and Dr. John Doe 22 when Fowler learns his identities.

I further order that Fowler's claim in Count VII of deliberate indifference to a serious medical need, and his corresponding Nevada State Constitutional claim, will proceed against Dr.

Minev, Dr. Faulkner, Taino, Hubbard-Pickett, Dr. Bryan, Dr. Agustin, and the URP and John Doe 23 when Fowler learns their identities.

I further order that Fowler's claim in Count VIII of deliberate indifference to a serious medical need, and his corresponding Nevada State Constitutional claim, will proceed against Dzurenda and Sandoval.

I further order that Fowler's free exercise of religion claim in Count IX, and his corresponding Nevada State Constitutional claim, as well as his RLUIPA claim in Count XI, will proceed against Calderin, Dzurenda, Sandoval, Hubbard-Pickett, Wickham, and Wilson.

I further order that Fowler's equal protection claim in Count X will proceed against Calderin

It is further ordered that Fowler's free exercise of religion claim in Count XII, his corresponding Nevada State Constitutional claim, and his RLUIPA claim will proceed against Calderin and Calvin Johnson.

I further order that Fowler's Eighth Amendment claim in Count XIII, as well as his corresponding Nevada State Constitutional claim, will proceed against Hubbard-Pickett, Wickham, Lozano, V. Johnson, Calvin Johnson, Williams, Bean, Dzurenda, Sandoval, and Sisolak.

I further order that Fowler's equal protection claim in Count XIV is dismissed with prejudice, as amendment would be futile.

I further order that Fowler's ADA and RA claims in Count XV are dismissed without prejudice.

I further order that Fowler's Eighth Amendment claim in Count XVI, as well as his corresponding Nevada State Constitutional claim, will proceed against Hubbard-Pickett, Lozano, Williams, Wickham, Barth, Dzurenda, Sandoval, and Sisolak.

I further order that Fowler's Eighth Amendment claim in Count XVII, as well as his corresponding Nevada State Constitutional claim, will proceed against Cooper, Roberson, Delporto, Williams, and Hubbard-Pickett.

I further order that Fowler's RLUIPA claims against Nevada ex rel. NDOC are dismissed with prejudice, as amendment would be futile.

I further order that Fowler's motions requesting permission to file documents via the United States Post office rather than through the e-filing system **(ECF Nos. 8, 9) are denied** without prejudice.

I further order that Fowler's motions regarding his first amended **complaint (ECF Nos. 11, 14) are denied** as moot.

I further order that Fowler's motion regarding his second amended complaint **(ECF No. 25)** is denied as moot.

I further order that Fowler's motion requesting that the Court take judicial notice of a previous case **(ECF No. 26) is denied** as moot.

I further order that Fowler's motions requesting a courtesy copy of the second amended complaint, the § 1983 complaint form, and documents to file a new application to proceed *in forma pauperis* **(ECF Nos. 48 and 50) are denied** without prejudice.

I further order that Fowler's motions regarding reconsideration of Fowler's screening order **(ECF Nos. 56 and 57) are granted** in part and denied in part.  Fowler's ADA and RA claims regarding a lack of medical treatment are hereby dismissed without prejudice, rather than

1    with prejudice.  And with regards to any ADA or RA claim, the State of Nevada ex rel NDOC is

2    dismissed without prejudice rather than with prejudice.

3         I further order that Fowler's motion to correct the docket **(ECF No. 63) is denied** as

4    moot.

5         I further order that Fowler's motion for an extension to file the TAC **(ECF No. 64) is**

6    **granted** and I accept the TAC.

7         I further order that Fowler's motion to strike ECF No. 72 **(ECF No. 73) is granted**.  The

8    Clerk of the Court is directed to strike ECF No. 72 from the docket.

9         I further order that a decision on Fowler's application for leave to proceed *in forma*

10   *pauperis* (ECF No. 65) is deferred.

11        I further order that given the nature of the claim that I have permitted to proceed, this

12   action is **STAYED** for 90 days to allow Fowler and the defendants an opportunity to settle their

13   dispute before the $350.00 filing fee is paid, an answer is filed, or the discovery process begins.

14   **During this 90-day stay period and until the stay is lifted, no other pleadings or papers**

15   **shall be filed in this case, and the parties shall not engage in any discovery, nor are the**

16   **parties required to respond to any paper filed in violation of the stay unless specifically**

17   **ordered to do so.**  I will refer this case to the court's Inmate Early Mediation Program, and a

18   subsequent order will be entered.  Regardless, within 90 days from the date this order is entered,

19   the Office of the Attorney General shall file the report form attached to this order regarding the

20   results of the 90-day stay, even if a stipulation for dismissal is entered prior to the end of the 90-

21   day stay.  If the parties proceed with this action, an order will issue setting a date for the

22   defendants to file an answer or other response.  Following the filing of an answer, a scheduling

23   order will be issued setting discovery and dispositive motion deadlines.

"Settlement" may or may not include payment of money damages.  It also may or may not include an agreement to resolve Fowler's issues differently.  A compromise agreement is one in which neither party is completely satisfied with the result, but both have given something up and both have obtained something in return.

I further order that if the case does not settle, Fowler will be required to pay the full $350.00 filing fee.  This fee cannot be waived.  If Fowler is allowed to proceed *in forma pauperis,* the fee will be paid in installments from his prison trust account. 28 U.S.C. § 1915(b). If Fowler is not allowed to proceed *in forma pauperis*, the $350.00 will be due immediately.

I further order that if any party seeks to have this case excluded from the inmate mediation program, that party shall file a "motion to exclude case from mediation" within 21 days from the date of this order.  The responding party shall have seven days to file a response. No reply shall be filed.

I further order the Clerk of the Court to electronically **SERVE** a copy of this order and a copy of the TAC (ECF No. 62) on the Office of the Attorney General of the State of Nevada, by adding the Attorney General of the State of Nevada to the docket sheet.  This does not indicate acceptance of service.

I further order the Attorney General's Office to advise the court within 21 days of the entry of this order whether it will enter a limited notice of appearance on behalf of the defendants for the purpose of settlement.  No defenses or objections, including lack of service, shall be waived as a result of the filing of the limited notice of appearance.

DATED THIS  26th day of October 2020.

_____
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SKYLER JAMES FOWLER, | Case No. 2:19-cv-01418-APG-DJA |
| Plaintiff, | REPORT OF ATTORNEY GENERAL RE:<br>RESULTS OF 90-DAY STAY |
| v. | |
| STEVE SISOLAK, et al., | |
| Defendants. | |

**NOTE: ONLY THE OFFICE OF THE ATTORNEY GENERAL SHALL FILE THIS FORM.  THE INMATE PLAINTIFF SHALL NOT FILE THIS FORM.**

On _____ [*the date of the issuance of the screening order*], the Court issued its screening order stating that it had conducted its screening pursuant to 28 U.S.C. § 1915A, and that certain specified claims in this case would proceed.  The Court ordered the Office of the Attorney General of the State of Nevada to file a report ninety (90) days after the date of the entry of the Court's screening order to indicate the status of the case at the end of the 90-day stay.  By filing this form, the Office of the Attorney General hereby complies.

## REPORT FORM

[Identify which of the following two situations (identified in bold type) describes the case, and follow the instructions corresponding to the proper statement.]

**Situation One: Mediated Case**: **The case was assigned to mediation by a court-appointed mediator during the 90-day stay.**  [If this statement is accurate, check **ONE** of the six statements below and fill in any additional information as required, then proceed to the signature block.]

_____    A mediation session with a court-appointed mediator was held on _____ [*enter date*], and as of this date, the parties have reached a settlement (*even if paperwork to memorialize the settlement remains to be completed*).  (*If this box is checked, the parties are on notice that they must SEPARATELY file either a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in the case until a specified date upon which they will file a stipulation of dismissal.*)

_____    A mediation session with a court-appointed mediator was held on _____ [*enter date*], and as of this date, the parties have not reached

a settlement.  The Office of the Attorney General therefore informs the Court of its intent to proceed with this action.

_____  No mediation session with a court-appointed mediator was held during the 90-day stay, but the parties have nevertheless settled the case.  (*If this box is checked, the parties are on notice that they must SEPARATELY file a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in this case until a specified date upon which they will file a stipulation of dismissal.*)

_____  No mediation session with a court-appointed mediator was held during the 90-day stay, but one is currently scheduled for _____ [*enter date*].

_____  No mediation session with a court-appointed mediator was held during the 90-day stay, and as of this date, no date certain has been scheduled for such a session.

_____  None of the above five statements describes the status of this case.  Contemporaneously with the filing of this report, the Office of the Attorney General of the State of Nevada is filing a separate document detailing the status of this case.

* * * * *

**Situation Two: Informal Settlement Discussions Case**: **The case was NOT assigned to mediation with a court-appointed mediator during the 90-day stay; rather, the parties were encouraged to engage in informal settlement negotiations.** [If this statement is accurate, check **ONE** of the four statements below and fill in any additional information as required, then proceed to the signature block.]

_____  The parties engaged in settlement discussions and as of this date, the parties have reached a settlement (*even if the paperwork to memorialize the settlement remains to be completed*).  (*If this box is checked, the parties are on notice that they must SEPARATELY file either a contemporaneous stipulation of dismissal or a motion requesting that the Court continue the stay in this case until a specified date upon which they will file a stipulation of dismissal.*)

_____  The parties engaged in settlement discussions and as of this date, the parties have not reached a settlement.  The Office of the Attorney General therefore informs the Court of its intent to proceed with this action.

_____  The parties have not engaged in settlement discussions and as of this date, the parties have not reached a settlement.  The Office of the Attorney General therefore informs the Court of its intent to proceed with this action.

_____  None of the above three statements fully describes the status of this case.  Contemporaneously with the filing of this report, the Office of the Attorney General of the State of Nevada is filing a separate document detailing the status of this case.

Submitted this _____ day of _____, _____ by:

Attorney Name: _____          _____

Print                                                              Signature

57

Address: _____        Phone:
                                          _____
         _____                Email:
                                          _____